**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| **INA PAVES,** *individually and on behalf of all others similarly situated*, | **Case No.: 0:23-cv-62375** |
| Plaintiff, | |
| | **CLASS ACTION COMPLAINT** |
| v. | |
| **CITRIX SYSTEMS, INC. and FRED HUTCHINSON CANCER CENTER,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Ina Paves, individually and on behalf of all similarly situated persons, alleges the following against Citrix Systems, Inc. ("Citrix") and Fred Hutchinson Cancer Center ("FHCC") (collectively, "Defendants"), based on personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents, as to all other matters:

## I.   INTRODUCTION

1.    Plaintiff brings this class action against Defendants for their failure to properly secure and safeguard Plaintiff's and other similarly situated customers' ("Class Members," as defined *infra*) sensitive information held by entities who used Citrix products, including Comcast Communications, LLC d/b/a Xfinity ("Xfinity"), FHCC, and many others. In the case of FHCC, the following data was disclosed: names, addresses, phone numbers, email addresses, dates of birth, Social Security numbers ("personally identifiable information" or "PII"), health insurance information, medical record number, patient account number, date(s) of service and/or certain clinical information, such as treatment/diagnosis information, lab results, or provider name

("Protected Health Information" or "PHI," as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA")) (collectively, "Private Information").[1]

2.      Citrix provides cloud computing services to over 16 million cloud users, and makes a variety of software products, including networking products.[2] Its clients include Xfinity, FHCC (and its affiliates), and many other entities.

3.      FHCC is a cancer hospital and research center in the Seattle, Washington area.[3] According to the Notice letter mailed by FHCC to victims of the data breach, FHCC and the University of Washington ("UW") are "close partners in providing cancer care services, performing research, and implementing related operations."[4] The two entities exchange information "under affiliation, clinical care, and research agreements and protocols."[5]

4.      By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiff and Class Members, Defendants assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

5.      On October 10, 2023, Citrix announced a vulnerability in the software product used by FHCC and thousands of other companies, known as the "Citrix Bleed" vulnerability, which has been exploited by ransomware cybercriminals.[6]

6.      On November 19, 2023, FHCC detected unauthorized access on "parts of [its] clinical network."[7] Its investigation "determined that an unauthorized third party access [its]

---

[1] Notice Letter, attached as ***Exhibit A*** ("Notice").
[2] https://www.citrix.com/about/ (last visited Jan. 6, 2024).
[3] https://fredhutch.org/en.html (last visited Jan. 6, 2024).
[4] Notice.
[5] *Id.*
[6] *Id.*; *What Is Citrix Bleed? The Next Ransomware Patch You Need*, Government Technology (Dec. 6, 2023), https://www.govtech.com/security/what-is-citrix-bleed-the-next-ransomware-patch-you-need (last visited Jan. 6, 2024).
[7] Notice.

clinical network and obtained certain files from [its] systems between November 19 and November 25, 2023."[8]

7.    On the "Notice to Our Patients of Data Security Incident" posted on its website, FHCC clarifies: "In this instance hackers exploited a vulnerability in a software called Citrix that allowed them to gain access to our network[.]"[9]

8.    Defendants failed to adequately protect Plaintiff's and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive information. This unencrypted, unredacted Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and its utter failure to protect its clients' customers' sensitive data. Hackers targeted and obtained Plaintiff's and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiff and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

9.    Plaintiff brings this action on behalf of all persons whose Private Information was compromised as a result of Defendants' failure to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of Defendants' inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendants' conduct amounts at least to negligence and violates federal and state statutes.

10.    Defendants disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable

---

[8] *Id.*
[9]    https://www.fredhutch.org/en/about/about-the-hutch/accountability-impact/notice-to-our-patients-of-data-security-incident.html (last visited Jan. 6, 2024).

measures and ensure those measures were followed by their IT vendors to ensure that the Private Information of Plaintiff and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party.

11.     Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

12.     Plaintiff and Class Members have suffered injury as a result of Defendants' conduct. These injuries include: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

13.     Plaintiff and Class Members seek to remedy these harms and prevent any future data compromise on behalf of herself and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## II.  PARTIES

14.     Plaintiff Ina Paves is, and at all times mentioned herein was, an individual citizen

4

and resident of the state of Washington.

15. Defendant Citrix is a corporation validly existing under the laws of Florida with its headquarters and principal place of business located at 851 W. Cypress Creek Road, Fort Lauderdale, Florida 33309.

16. Defendant FHCC is a nonprofit corporation validly existing under the laws of Washington with its headquarters and principal place of business located at 1100 Fairview Ave. N., Seattle, Washington 98109.

## III.  JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members is in the millions, many of whom reside outside the state of Florida and have different citizenship from Defendants, including Plaintiff. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

18. This Court has general personal jurisdiction over Citrix because it is headquartered in this District. This Court has specific personal jurisdiction over FHCC because it (or its affiliates) used Citrix products with respect to Plaintiff's claims.

19. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants are subject to the Court's personal jurisdiction with respect to this action, and Citrix has harmed Class Members residing in this District.

## IV.  FACTUAL ALLEGATIONS

### A.     *Citrix's Businesses*

20. Citrix is a multinational private corporation that sells cloud and networking software. FHCC is a nonprofit cancer hospital that also serves as UW Medicine's cancer

program.[10]

21.     Plaintiff and Class Members are current and former patients and customers of companies that use Citrix products, including FHCC (and its affiliates, UW and Harborview Medical Center), who provided their Private Information to those companies as a condition of obtaining healthcare services..

22.     The information held by Citrix in its computer systems or those of its vendors at the time of the Data Breach included the unencrypted Private Information of Plaintiff and Class Members.

23.     Upon information and belief, FHCC made promises and representations to its customers, including Plaintiff and Class Members, that the Private Information collected from them as a condition of obtaining services would be kept safe, confidential, that the privacy of that information would be maintained, and that Citrix would delete any sensitive information after they were no longer required to maintain it.

24.     Plaintiff and Class Members provided their Private Information to FHCC with the reasonable expectation and on the mutual understanding that it, and any of its vendors, would comply with its obligations to keep such information confidential and secure from unauthorized access.

25.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiff and Class Members relied on the sophistication of Defendants to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiff and Class Members value the confidentiality of their

---

[10] https://www.fredhutch.org/en/about/about-the-hutch.html (last visited Jan. 6, 2024).

Private Information and demand security to safeguard their Private Information.

26.     Defendants had a duty to adopt reasonable measures to protect the Private Information of Plaintiff and Class Members from involuntary disclosure to third parties and to audit, monitor, and verify the integrity of their IT vendors and affiliates. Defendants have a duty to keep consumer's Private Information safe and confidential.

27.     Defendants had obligations created by the FTC Act, HIPAA, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

28.     Defendants derived a substantial economic benefit from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Defendants could not perform the services they provide.

29.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

**B.      *The Data Breach***

30.     According to the Notice, "[o]n November 19, 2023, [FHCC] detected unauthorized activity on limited parts of [its] clinical network. [It] immediately took steps to contain the activity and began an investigation with the assistance of a third-party forensic firm. The investigation determined that an unauthorized third party accessed [its] clinical network and obtained certain files from [its] systems between November 19 and November 25, 2023."[11]

31.     Omitted from the Notice are the details of the root cause of the Data Breach, the

---

[11] Notice.

vulnerabilities exploited, and the specific remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

32.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

33.     Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed. Moreover, Defendants failed to exercise due diligence in selecting its vendors or deciding with whom they would share sensitive Private Information.

34.     Plaintiff further believes her Private Information, and that of Class Members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type. Moreover, following the Data Breach, Plaintiff has experienced suspicious spam and believes this be an attempt to secure additional Private Information from him.

**C.      *Citrix Acquires, Collects, and Stores Plaintiff's and Class Members' Private Information.***

35.     Citrix derives a substantial economic benefit from providing software for its clients, including FHCC, and as a part of providing that software, Citrix retains and stores Plaintiff's and Class Members' Private Information.

36.     By obtaining, collecting, and storing the Private Information of Plaintiff and Class

Members, Citrix assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

37.     Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Citrix to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

38.     Citrix could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members or by exercising due diligence in selecting their IT vendors and properly auditing those vendor's security practices.

39.     Upon information and belief, Citrix made promises to Plaintiff and Class Members to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

40.     Citrix's negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

**E.**     ***Defendants Knew or Should Have Known of the Risk Because Institutions in Possession of Private Information Are Particularly Suspectable to Cyber Attacks.***

41.     Defendants' data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store Private Information, like Defendants, preceding the date of the breach.

42.     Data thieves regularly target companies like Defendants due to the highly sensitive information in their custody. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize

9

that Private Information through unauthorized access.

43.     In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[12]

44.     In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

45.     As a custodian of Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class members, and of the foreseeable consequences if their data security systems, or those of their vendors, were breached, including the significant costs imposed on Plaintiff and Class Members as a result of a breach.

46.     Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

47.     At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendants' data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

---

[12] *See* 2021 Data Breach Annual Report (ITRC, Jan. 2022) (https://notified.idtheftcenter.org/s/), at 6.

48.     Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Defendants' server(s), amounting to potentially thousands of individuals' detailed, Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

49.     The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

50.     The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

51.     As corporation in possession of their customers' and former customers' Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to them by Plaintiff and Class Members and of the foreseeable consequences if their data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Nevertheless, Defendants failed to take adequate cybersecurity measures to prevent the Data Breach.

**F.**     ***Value of Personally Identifiable Information***

52.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[13] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other

---

[13] 17 C.F.R. § 248.201 (2013).

things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[14]

53. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[15]

54. For example, Private Information can be sold at a price ranging from $40 to $200.[16] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[17]

55. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names and Social Security numbers.

56. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[18]

57. Among other forms of fraud, identity thieves may obtain driver's licenses,

---

[14] *Id.*

[15] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Jan. 6, 2024).

[16] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Jan. 6, 2024).

[17] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Jan. 6, 2024).

[18] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Jan. 6, 2024).

government benefits, medical services, and housing or even give false information to police.

58.     The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[19]

### G.     *Defendants Failed to Comply with FTC Guidelines.*

59.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.,* 799 F.3d 236 (3d Cir. 2015).

60.     In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct

---

[19] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited Jan. 6, 2024).

any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

61.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

62.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential customer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63.     As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of their data security practices. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

64.     Defendants was at all times fully aware of their obligation to protect the Private Information of customers yet failed to comply with such obligations. Defendants was also aware of the significant repercussions that would result from their failure to do so.

**H.      *FHCC Fails to Comply with HIPAA Guidelines.***

65.      FHCC is a covered Business Associate under HIPAA (45 C.F.R. § 160.103) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E (" Standards for Privacy of Individually Identifiable Health Information") , and Security Rule (" Security Standards for the Protection of Electronic Protected Health Information") , 45 C.F.R. Part 160 and Part 164, Subparts A and C.

66.      FHCC is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH") .[20] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

67.      HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

68.      HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

69.      HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

70.      "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

71.      HIPAA's Security Rule requires FHCC to do the following:

---

[20] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

a.      Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b.      Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.      Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d.      Ensure compliance by its workforce.

72.     HIPAA also requires FHCC to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, FHCC is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

73.     HIPAA and HITECH also obligated FHCC to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

74.     HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

75.     HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful

effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

76. HIPAA also requires the Office of Civil Rights (" OCR") , within the Department of Health and Human Services (" HHS") , to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[21] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[22]

### I.    *Defendants Failed to Comply with Industry Standards.*

77. As noted above, experts studying cybersecurity routinely identify institutions as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

78. Some industry best practices that should be implemented by institutions dealing with sensitive Private Information, like Defendants, include but are not limited to: educating all customers, strong password requirements, multilayer security including firewalls, anti-virus and

---

[21] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Jan. 6, 2024)
[22]   https://www.hhs.gov/hipaa/foQAZr-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Jan 6, 2024).

anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which customers can access sensitive data. As evidenced by the Data Breach, Defendants failed to follow some or all of these industry best practices.

79.     Other best cybersecurity practices that are standard at large institutions that store Private Information include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach, Defendants failed to follow these cybersecurity best practices.

80.     Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

81.     Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**J.     *Defendants Breached Their Duties to Safeguard Plaintiff's and Class Members' Private Information.***

82.     In addition to its obligations under federal and state laws, Defendants owed duties to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed duties to Plaintiff and Class Members to provide reasonable security, including consistency with

industry standards and requirements, and to ensure that their computer systems, networks, and protocols adequately protected the Private Information of Class Members.

83.     Defendants breached their obligations to Plaintiff and Class Members and/or were otherwise negligent and reckless because it failed to properly maintain and safeguard their computer systems and data and failed to audit, monitor, or ensure the integrity of their data security practices. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

    a.    Failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.    Failing to adequately protect customers' Private Information;

    c.    Failing to properly monitor their own data security systems for existing intrusions;

    d.    Failing to audit, monitor, or ensure the integrity of their vendor's data security practices;

    e.    Failing to sufficiently train their customers and vendors regarding the proper handling of their customers' Private Information;

    f.    Failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

    g.    Failing to adhere to industry standards for cybersecurity as discussed above; and

    h.    Otherwise breaching their duties and obligations to protect Plaintiff's and Class Members' Private Information.

84.     Defendants negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing cyberthieves to access their computer network and systems which contained unsecured and unencrypted Private Information.

19

85. Had Defendants remedied the deficiencies in their information storage and security systems or those of their vendors and affiliates, followed industry guidelines, and adopted security measures recommended by experts in the field, they could have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

**J.** ***Common Injuries & Damages***

86. As a result of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their Private Information; (e) invasion of privacy; and (f) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

**K.** ***The Data Breach Increases Victims' Risk of Identity Theft.***

87. Plaintiff and Class Members are at a heightened risk of identity theft for years to come.

88. The unencrypted Private Information of Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted Private Information may fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals

can easily access the Private Information of Plaintiff and Class Members.

89.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

90.     Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity—or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

91.     For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data Breaches can be the starting point for these additional targeted attacks on the victim.

92.     One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[23]

---

[23] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a

21

93.     With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

94.     The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

95.     The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like driver's license numbers) of Plaintiff and the other Class Members.

96.     Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

97.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

**L.**     *Loss of Time to Mitigate Risk of Identity Theft and Fraud*

98.     As a result of the recognized risk of identity theft, when a Data Breach occurs, and

---

"mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Jan. 6, 2024).

an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet, the resource and asset of time has been lost.

99.     Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience as a result of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts for any indication of fraudulent activity, which may take years to detect.

100.     These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[24]

101.     These efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on

---

[24] *See* United States Government Accountability Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

their credit, and correcting their credit reports.[25]

102.    A study by Identity Theft Resource Center shows the multitude of harms caused by fraudulent use of personal and financial information:[26]



103.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[27]

---

[25] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Jan. 6, 2024).

[26] Jason Steele, "Credit Card and ID Theft Statistics," Oct. 24, 2017, https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276.php (last visited Jan. 6, 2024).

[27] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Jan. 6, 2024) ("GAO Report").

**M.**     *Diminution Value of Private Information*

104.     Private Information is a valuable property right.[28] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

105.     An active and robust legitimate marketplace for Private Information exists. In 2019, the data brokering industry was worth roughly $200 billion.[29]

106.     In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[30,31]

107.     Consumers who agree to provide their web browsing her tory to the Nielsen Corporation can receive up to $50.00 a year.[32]

108.     Conversely, sensitive Private Information can sell for as much as $363 per record on the dark web according to the Infosec Institute.[33]

109.     As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of

---

[28] *See, e.g.*, Randall T. Soma, et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[29] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Jan. 6, 2024).

[30] https://datacoup.com/ (last visited Jan. 6, 2024).

[31] https://digi.me/what-is-digime/ (last visited Jan. 6, 2024).

[32] Nielsen Computer & Mobile Panel, *Frequently Asked Questions*, https://computermobilepanel. nielsen.com/ui/US/en/faqen.html (last visited Jan. 6, 2024).

[33] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/     (last visited Jan. 6, 2024).

value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

110.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change, e.g., names and Social Security numbers.

111.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

112.    The fraudulent activity resulting from the Data Breach may not come to light for years.

113.    At all relevant times, Citrix knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiff and Class Members, and of the foreseeable consequences that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

114.    Citrix were, or should have been, fully aware of the unique type and the significant volume of data on its network, amounting to thousands of individuals' detailed personal information, upon information and belief, and thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

115.    The injuries to Plaintiff and Class Members were directly and proximately caused by Citrix's failure to implement or maintain adequate data security measures for the Private

Information of Plaintiff and Class Members.

**N.**     *Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary.*

116.     Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information involved, and the volume of data obtained in the Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

117.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

118.     Consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

119.     The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Citrix's failure to safeguard their Private Information.

**O.**     *Plaintiff's Experience*

120.     Plaintiff Ina Paves is a resident of Bellevue, Washington.

27

121.     Plaintiff never had a relationship with FHCC, but recalls being a patient of UW Medical Center and/or Harborview Medical Center circa 2003-04.

122.     In order to obtain healthcare services from UW Medical Center and Harborview Medical Center, Plaintiff would have been required to provide her Private Information to them, and (apparently) indirectly to Defendants, including her name, address, phone number, email address, date of birth, Social Security number, health insurance information, including treatment/diagnosis information, lab results, and provider name.

123.     At the time of the Data Breach—around November 19 to 25, 2023—Defendants retained Plaintiff's Private Information in their systems.

124.     Plaintiff is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Citrix had she known of Citrix's lax data security policies.

125.     Plaintiff received the Notice letter from FHCC dated December 28, 2023.

126.     As a result of the Data Breach, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including contacting credit bureaus and checking her financial accounts for any indication of fraudulent activity, which may take years to detect. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

127.     Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) lost or diminished value of her

28

Private Information; (ii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (iii) invasion of privacy; (iv) loss of benefit of the bargain; and (v) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Citrix fail to undertake appropriate and adequate measures to protect the Private Information.

128.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

129.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

130.    As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

131.    Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

## V. CLASS ACTION ALLEGATIONS

132.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

133.    Specifically, Plaintiff proposes the following class definition, subject to amendment as appropriate:

> All individuals in the United States whose Private Information was disclosed in the Data Breach (the "Class").

29

134. Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

135. Plaintiff reserves the right to modify or amend the definition of the proposed Class, as well as add subclasses, before the Court determines whether certification is appropriate.

136. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

137. Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes that the proposed Class includes about 1.3 million individuals who have been damaged by Defendants' conduct as alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendants' records.

138. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

   a. Whether Defendants engaged in the conduct alleged herein;

   b. Whether Defendants' conduct violated the FTCA and/or HIPAA;

   c. When Defendants learned of the Data Breach;

   d. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

   e. Whether Defendants' data security systems prior to and during the Data Breach

complied with applicable data security laws and regulations;

f.    Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

g.    Whether Defendants owed duties to Class Members to safeguard their Private Information;

h.    Whether Defendants breached their duties to Class Members to safeguard their Private Information;

i.    Whether hackers obtained Class Members' Private Information via the Data Breach;

j.    Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

k.    Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

l.    Whether Defendants knew or should have known its data security systems and monitoring processes were deficient;

m.    What damages Plaintiff and Class Members suffered as a result of Defendants' misconduct;

n.    Whether Defendants' conduct was negligent;

o.    Whether FHCC breached contracts it had with its patients including Plaintiff and Class Members;

p.    Whether Defendants were unjustly enriched;

q.    Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

31

r.    Whether Plaintiff and Class Members are entitled to additional credit or identity monitoring and monetary relief; and

s.    Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

139. <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, inter alia, all Class Members were injured through the common misconduct of Defendants. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

140. <u>Adequacy of Representation.</u> Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

141. <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members. For example, all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

142. <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered

in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Citrix. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

143.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(2). Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

144.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach. Class Members have already been preliminarily identified and sent a Notice Letter by FHCC.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**Negligence and Negligence Per Se**
**(On Behalf of Plaintiff and the Class Against Citrix)**

145.    Plaintiff restates and realleges paragraphs 1 through 144 above as if fully set forth herein.

146.    Citrix's clients including FHCC (and its affiliates) require their customers, including Plaintiff and Class Members, to submit non-public Private Information as a condition of

33

obtaining services.

147. Citrix had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

148. By assuming the responsibility to collect and store this data, Citrix had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

149. Citrix had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

150. Citrix owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

151. Citrix also had a duty to exercise appropriate clearinghouse practices to remove former customers' Private Information they were no longer required to retain pursuant to regulations.

152. Moreover, Citrix had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

153. Citrix had and continues to have duties to adequately disclose that the Private Information of Plaintiff and the Class within Citrix's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such

notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

154.   Citrix breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Citrix include, but are not limited to, the following:

   a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

   b. Failing to adequately monitor the security of their networks and systems;

   c. Failing to audit, monitor, or ensure the integrity of their vendor's data security practices;

   d. Allowing unauthorized access to Class Members' Private Information;

   e. Failing to detect in a timely manner that Class Members' Private Information had been compromised;

   f. Failing to remove former customers' Private Information they were no longer required to retain pursuant to regulations; and

   g. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

155.   Citrix violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Citrix's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense

damages that would result to Plaintiff and the Class.

156.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

157.    Citrix's violation of Section 5 of the FTC Act constitutes negligence per se.

158.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

159.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Citrix's inadequate security practices.

160.    It was foreseeable that Citrix's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

161.    Citrix had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

162.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Citrix knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on its systems.

163.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

164.    Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, Citrix's possession.

165.    Citrix was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

166.    Citrix's duties extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

167.    Citrix has admitted that the Private Information of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

168.    But for Citrix's wrongful and negligent breaches of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

169.    There is a close causal connection between Citrix's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of Citrix's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

170.    As a direct and proximate result of Citrix's negligence, Plaintiff and the Class

have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Citrix's possession and is subject to further unauthorized disclosures so long as Citrix fails to undertake appropriate and adequate measures to protect the Private Information.

171. As a direct and proximate result of Citrix's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

172. Additionally, as a direct and proximate result of Citrix's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Citrix's possession and is subject to further unauthorized disclosures so long as Citrix fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

173. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

174. Citrix's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

175. Plaintiff and Class Members are also entitled to injunctive relief requiring Citrix to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual

audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**Negligence and Negligence Per Se**
**(On Behalf of Plaintiff and the Class Against FHCC)**

176.    Plaintiff restates and realleges paragraphs 1 through 144 above as if fully set forth herein.

177.    FHCC engaged Citrix for computer networking services, and shared its and its affiliates' patients'—*i.e.*, Plaintiff's and Class Members'—non-public Private Information with Citrix.

178.    FHCC had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information were wrongfully disclosed.

179.    By assuming the responsibility to collect and store this data, FHCC had a duty of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

180.    FHCC had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

181.    FHCC's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of

the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

182. FHCC owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the Private Information.

183. FHCC also had a duty to exercise appropriate clearinghouse practices to remove former customers' Private Information they were no longer required to retain pursuant to regulations.

184. Moreover, FHCC had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

185. FHCC had and continues to have duties to adequately disclose that the Private Information of Plaintiff and the Class within Citrix's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

186. FHCC breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by FHCC include, but are not limited to, the following

    a. Failing to audit, monitor, or ensure the integrity of their vendor's data security practices;

    b. Allowing unauthorized access to Class Members' Private Information;

c. Failing to keep Class Members' Private Information in encrypted format;

d. Failing to remove former customers' Private Information they were no longer required to retain pursuant to regulations; and

e. Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

187. FHCC violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. FHCC's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

188. Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

189. FHCC's violation of Section 5 of the FTC Act constitutes negligence per se.

190. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

191. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of FHCC's inadequate security practices.

192. It was foreseeable that FHCC's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach

of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

193. FHCC had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class could and would suffer if the Private Information were wrongfully disclosed.

194. Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. FHCC knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiff and the Class, the critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on its systems.

195. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

196. Plaintiff and the Class had no ability to protect their Private Information that was in, and possibly remains in, FHCC's possession.

197. FHCC was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

198. FHCC's duties extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

199. FHCC has admitted that the Private Information of Plaintiff and the Class was

wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

200. But for FHCC's wrongful and negligent breaches of duties owed to Plaintiff and the Class, the Private Information of Plaintiff and the Class would not have been compromised.

201. There is a close causal connection between FHCC's failure to implement security measures to protect the Private Information of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The Private Information of Plaintiff and the Class was lost and accessed as the proximate result of FHCC's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

202. As a direct and proximate result of FHCC's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in FHCC's possession and is subject to further unauthorized disclosures so long as FHCC fails to undertake appropriate and adequate measures to protect the Private Information.

203. As a direct and proximate result of FHCC's negligence, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

204. Additionally, as a direct and proximate result of FHCC's negligence, Plaintiff

and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in FHCC's possession and is subject to further unauthorized disclosures so long as FHCC fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

205.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

206.    FHCC's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiff and Class Members in an unsafe and insecure manner.

207.    Plaintiff and Class Members are also entitled to injunctive relief requiring FHCC to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

### COUNT III
### Breach of Implied Contract
### (On Behalf of Plaintiff and the Class Against FHCC)

208.    Plaintiff restates and realleges paragraphs 1 through 144 above as if fully set forth herein.

209.    Plaintiff and Class Members were required to provide their Private Information to FHCC as a condition of receiving healthcare services from FHCC or its affiliates.

210.    Plaintiff and the Class entrusted their Private Information to FHCC. In so doing, Plaintiff and the Class entered into implied contracts with FHCC by which FHCC agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

211. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations and were consistent with industry standards.

212. Implicit in the agreement between Plaintiff and Class Members and FHCC to provide Private Information, was the latter's obligation to: (a) take reasonable steps to safeguard that Private Information, (b) prevent unauthorized disclosures of the Private Information, (c) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their Private Information, (d) reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses, (e) retain the Private Information only under conditions that kept such information secure and confidential.

213. The mutual understanding and intent of Plaintiff and Class Members on the one hand, and FHCC, on the other, is demonstrated by their conduct and course of dealing.

214. FHCC required Plaintiff and Class Members to provide their Private Information as a condition of receiving services.

215. In accepting the Private Information of Plaintiff and Class Members, FHCC understood and agreed that they were required to reasonably safeguard the Private Information from unauthorized access or disclosure.

216. On information and belief, FHCC further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' Private Information would remain protected.

217. Plaintiff and Class Members would not have entrusted their Private Information to FHCC in the absence of the implied contract between them and FHCC to keep their information

45

reasonably secure.

218.    Plaintiff and Class Members would not have entrusted their Private Information to FHCC in the absence of their implied promise to monitor their computer systems and networks to ensure that they adopted reasonable data security measures.

219.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with FHCC.

220.    FHCC breached the implied contracts made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

221.    As a direct and proximate result of FHCC's breach of the implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

222.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

223.    Plaintiff and Class Members are also entitled to injunctive relief requiring FHCC to, *e.g.*, (i) strengthen its data monitoring procedures; (ii) submit to future annual audits of those monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

### COUNT IV
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class Against Citrix)**

224.    Plaintiff restates and realleges paragraphs 1 through 144 above as if fully set forth herein.

225.     This count is pleaded in the alternative to the Breach of Implied Contract claim above (Count III).

226.     Plaintiff and Class Members conferred a monetary benefit on Citrix, in providing it, through Citrix's clients, with their valuable Private Information.

227.     Citrix knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. Citrix profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

228.     Citrix failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

229.     Citrix acquired the Private Information through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

230.     If Plaintiff and Class Members had known Citrix would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information with Citrix, through its clients.

231.     Plaintiff and Class Members have no adequate remedy at law.

232.     Under the circumstances, it would be unjust for Citrix to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

233.     As a direct and proximate result of Citrix' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with

47

attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Zeroed In's possession and is subject to further unauthorized disclosures so long as Citrix fails to undertake appropriate and adequate measures to protect the Private Information.

234.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Citrix and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Citrix from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

235.    Plaintiff and Class Members may not have an adequate remedy at law against Citrix, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class Against FHCC)**

236.    Plaintiff restates and realleges paragraphs 1 through 144 above as if fully set forth herein.

237.    This count is pleaded in the alternative to the Breach of Implied Contract claim above (Count III).

238.    Plaintiff and Class Members conferred a monetary benefit on FHCC. Specifically, they obtained services from FHCC, and in so doing also provided FHCC with their Private Information. In exchange, Plaintiff and Class Members should have received from FHCC the

services that were the subject of the transaction and should have had their Private Information protected with adequate data security.

239. FHCC knew that Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the Private Information entrusted to it. FHCC profited from Plaintiff's retained data and used Plaintiff's and Class Members' Private Information for business purposes.

240. FHCC failed to secure Plaintiff's and Class Members' Private Information and, therefore, did not fully compensate Plaintiff or Class Members for the value that their Private Information provided.

241. FHCC acquired the Private Information through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

242. If Plaintiff and Class Members had known FHCC would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their Private Information, they would not have entrusted their Private Information with FHCC.

243. Plaintiff and Class Members have no adequate remedy at law.

244. Under the circumstances, it would be unjust for FHCC to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

245. As a direct and proximate result of FHCC's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) lost or diminished value of Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) loss of benefit of the bargain; (v) and increase in spam calls, texts, and/or emails; and (vi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for

unauthorized third parties to access and abuse; and (b) remains backed up in FHCC's possession and is subject to further unauthorized disclosures so long as FHCC fails to undertake appropriate and adequate measures to protect the Private Information.

246.     Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from FHCC and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by FHCC from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

247.     Plaintiff and Class Members may not have an adequate remedy at law against FHCC, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendants and that the Court grant the following:

A.    For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class, pursuant to Federal Rule of Civil Procedure 23;

B.    For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii. requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v. prohibiting Defendants from maintaining the Private Information of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vii.      requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.      requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures; requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

ix.      requiring Defendants to conduct regular database scanning and securing checks;

x.      requiring Defendants to establish an information security training program that includes at least annual information security training for all customers, with additional training to be provided as appropriate based upon the customers' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi.      requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.      requiring Defendants to implement a system of tests to assess their respective customers' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically

52

testing customers' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xiii.   requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.   requiring Defendants to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.   requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xvi.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.   For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.   For an award of punitive damages, as allowable by law;

53

F.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.    Pre- and post-judgment interest on any amounts awarded; and

H.    Such other and further relief as this court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  January 7, 2024.        Respectfully submitted,

*/s/ Jeff Ostrow*
Jeff Ostrow, FBN 121452
Steven Sukert, FBN 1022912
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
sukert@kolawyers.com

William "Billy" Peerce Howard, FBN 103330
**THE CONSUMER PROTECTION FIRM, PLLC**
301 East Jackson Street, Suite 2340
Truist Place
Tampa, FL 33602
Telephone: 813-500-1500
billy@TheConsumerProtectionFirm.com

Bart D. Cohen (admitted *pro hac vice*)
**BAILY & GLASSER, LLP**
1622 Locust Street
Philadelphia, PA 19103
Telephone: 215-274-2103
bcohen@baileyglasser.com

*Counsel for Plaintiff and the Putative Class*

54